ORIGINAL

FILED
AUG - 4 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YATES INTERNATIONAL, L.L.C.

Plaintiff,

COFC No. 06-570 C

v

UNITED STATES OF AMERICA,

Defendant.

## COMPLAINT

NOW COMES Yates International, L.L.C. ("Yates International" or "Contractor"), by and through its undersigned attorney, and for its Complaint alleges as follows:

## INTRODUCTORY STATEMENT

1. Yates International seeks to appeal a final decision by contracting officer ("CO") Edward G. West on June 29, 2006, on behalf of the Defendant United States of America, Department of Defense ("DOD")/Defense Logistics Agency ("DLA"), approving the Government's claim for $127,576.79 in reprocurement costs subsequent to the Government's termination for default of two contracts related to the refurbishment and refilling of compressed gas cylinders.

2. Yates International has instituted a suit against DOD/DLA for its wrongful termination for default of the contracts, which is pending before the Honorable Judge Allegra of this Court and is Docket No. 06-157C.

**PARTIES**

3. Yates International is a corporation formed under the laws of the Commonwealth of Virginia.

4. Defendant is the United States of America, acting through its executive agency, DOD/DLA.

**JURISDICTION**

5. Jurisdiction is appropriate in this Court pursuant to 41 U.S.C. § 609(a)(1) and 28 U.S.C. § § 1491(a)(1) & (2).

**STATEMENT OF FACTS**

**The Compressed Gas Cylinder Program**

6. In September 2003, DOD/DLA awarded Yates International two contracts. The first was the Compressed Gas Cylinder Refurbishment Contract ("Refurbishment Contract") and the second was the Compressed Gas Cylinder Refill and Delivery Contract ("Refill Contract") (collectively the "Contracts").

7. Through the Contracts, DOD/DLA, through its subordinate units, the Defense Supply Center Richmond ("DSCR") and Defense Logistics Agency-Europe, sought to utilize the benefits of a centralized compressed gas cylinder program for its industrial gas customers in Europe.

8. Prior to this program, compressed gas cylinders were ordered by DOD/DLA customers in Europe and shipped overseas from a DSCR depot located in Richmond, Virginia. However, due to high overseas shipping costs, rather than being returned stateside to DSCR, used cylinders were either refilled locally or stored empty at various locations throughout Europe.

9. The lack of a centralized compressed gas cylinder program resulted in higher ordering, shipping and storage costs, and longer requisitioning and delivery time.

10. The Contracts established a centralized compressed gas cylinder test program for selected DOD/DLA industrial gas customers in Germany. If the test program was successful, DOD/DLA intended to expand the compressed gas cylinder program to its customers throughout Europe.

11. To be more competitive, efficient and cost-effective with regard to the Contracts, Yates International decided to locate its compressed gas facility in The Netherlands (Holland), closer to DOD/DLA's European industrial gas customers.

**The Refurbishment Contract**

12. The Refurbishment Contract, Contract No. SP0450-03-D-1411, is a one-year, fixed-price, requirements contract for the removal and refurbishment of 11,101 medical oxygen cylinders located at the U.S. Army Medical Material Center Europe in Pirmasens, Germany.

13. The Refurbishment Contract was awarded to Yates International on September 16, 2003. The total estimated price of the Refurbishment Contract was $384,000.

14. Under the Refurbishment Contract, 500 of the 11,101 cylinders, which were still full of medical oxygen, were to be repainted and relabeled only, while the remaining cylinders were to be vented and completely refurbished so that they could be used to hold other gases.

15. Yates International would transport the 11,101 cylinders to its Holland facility for refurbishment, which included inspection, venting, sand blasting, cleaning, hydrostatic testing, painting and labeling.

16. The Refurbishment Contract included a list of possible demands (i.e., types of gases) that the refurbished cylinders were required to hold.

17. The initial minimum delivery order quantity was 2,000 refurbished cylinders, which could be 2,000 or more of any type of cylinder or a mixture totaling 2,000 or more, for refurbishment. The maximum delivery order quantity was 11,101 refurbished cylinders of any one cylinder type or a mixture.

18. Yates International was required to have the capability to refurbish at least 2,000 cylinders per month.

19. On August 4, 2004, the Refurbishment Contract was modified to reduce the minimum order quantity to 1,400 refurbished cylinders.

20. The August 4, 2004 Refurbishment Contract modification also reduced the 1,400 minimum order quantity by one refurbished cylinder for every three cylinders filled and delivered, per month, under the Refill Contract (described below), since some of the same Yates International workers were used to complete both contracts.

21. According to the Refurbishment Contract, Yates International was allowed 15 days from the date of the basic contract to take possession of all 11,101 cylinders and store them on Contractor property in a secure location.

22. The first delivery order was to provide Yates International with a 60-day ramp-up period to allow for acquisition and/or setup of equipment.

23. Approximately 1,200 of the refurbished cylinders were to be delivered to the Defense Distribution Depot Europe at Germersheim, Germany, while the remaining refurbished cylinders were to be delivered to a final location to be determined at a later date.

24. On January 21, 2004, DSCR issued a Show Cause Notice to Yates International. According to the Show Cause Notice, the CO was considering terminating the Refurbishment Contract because Yates International, which was required to complete 2,000 refurbished cylinders by December 16, 2003 and at least 2,000 cylinders per month thereafter, had "failed to perform on Contract SP0450-03-D-1414 within the time required by the delivery schedule."

25. On January 30, 2004, Yates International responded to the Show Cause Notice, explaining that it had overcome numerous unforeseen events that were beyond its control and was "working diligently to ensure success of the [Refurbishment] Contract."

26. On February 3, 2004, DSCR issued a letter stating that Yates International's response to the Show Cause Notice was inadequate. Accordingly, on February 9, 2004, Yates International submitted a second response to DSCR's Show Cause Notice and explained that it had fulfilled a significant number of the Refurbishment Contract's provisions, including removal and storage of all 11,101 cylinders at a secure site and refurbishment of 290 cylinders, with several hundred more nearing completion.

27. DSCR permitted Yates International to continue performing the contract.

28. On February 8, 2005, more than a year after it issued the first Show Cause Notice, DSCR issued a second Show Cause Notice to Yates International.

29. According to the second Show Cause Notice, the CO was considering terminating the contract because "the balance of line item 0010 on contract SP0450-03-D-1411-0006 . . . consisting of 357 refurbished cylinders, was due on December 5, 2004" and Yates International had "failed to perform on this contract within the time required by the contract terms."

30. In the second Show Cause Notice, the CO also requested assurance that Yates International "can fulfill this contract."

31. On March 3, 2005, DSCR unilaterally terminated the Refurbishment Contract for default.

32. According to the notice of termination, which was issued by contract modification, the contract was terminated "for not making delivery of the contract." The notice alleged no other acts or omissions that constituted default.

33. The termination for default was not based on alleged anticipatory repudiation.

34. The notice included a statement that it was the final decision of the CO and informed Yates International of its right to bring an action directly in the United States Court of Federal Claims within twelve months of the date of receipt of the CO's decision.

Cylinder Caps:

35. The protective cylinder caps on all of the 11,101 Government-furnished compressed gas cylinders experienced significant rusting while being stored outside, exposed to the elements, at the U.S. Army Medical Material Center Europe in Pirmasens, Germany.

36. This rusting occurred prior to the award of the Refurbishment Contract to Yates International, and resulted from DOD/DLA's failure to follow proper procedures, contained in DOD Instruction 4145.19-R-2, for the preparation and storage of compressed gas cylinders.

37. During the pre-bid process, Yates International specifically requested, but was denied, as were all potential bidders, access to the storage site at Pirmasens, Germany in order to conduct a pre-bid inspection of the cylinders.

38. In lieu of an on-site inspection of the cylinders during the pre-bid process, DOD/DLA provided Yates International with photos of the cylinder storage site. However, due to poor photo resolution and the distance from which the photos were taken, it was impossible to detect the rusting of the cylinder caps from the DOD/DLA-provided photo.

39. Yates International requested, but was denied, a pre-bid meeting with DOD/DLA to discuss, among other things, the condition of the cylinders, including the cylinder caps.

40. Yates International did not know, and had no reason to know, that all 11,101 valve caps were rusted onto the cylinders.

41. The rusting of the cylinder caps caused Yates International to expend additional time and resources to remove the caps before refurbishment could begin. Since the rusted cylinder caps could not be removed by hand, the normal method, and since the cylinders were still full of oxygen, special non-sparking tools were required to remove the caps.

42. During a pre-bid phone conversation, the CO told Yates International to "just bid the contract" and that if the rusted caps became an issue, it would be addressed after contract award.

43. Subsequently, after contract award, the CO confirmed this in an October 17, 2003 e-mail when he instructed Yates International to begin refurbishment of the cylinders, notwithstanding the rust problem. At that time, the CO also stated that he would "take care of the rust [issue]" upon the cylinders' arrival at Yates International's Holland facility.

44. On December 20, 2004, Yates International submitted a claim for equitable adjustment for the costs associated with removing the rusted caps in the amount of $91,296.

45. In response to Yates International's claim, on February 7, 2005, nearly a full year after the termination, DOD/DLA authorized reimbursement to Yates International in the amount of $42,921, but failed to grant Yates International an appropriate extension of performance time.

46. In reimbursing Yates International for actual expenses incurred in removing the rusted cylinder caps, DOD/DLA stated that "[t]he Government does accept your contention that the 11,000 cylinders . . . were not properly preserved for long-term storage" at Pirmasens, Germany.

47. Yates International's performance of the Refurbishment Contract was delayed for at least 30 days by the Government's failure to disclose the deteriorated condition of the cylinder caps.

48. The delay resulted from DOD/DLA's failure to provide notification of, or an opportunity to inspect, the rusted cylinder caps and was a primary cause of Yates International's alleged default.

Progress Payments:

49. The Refurbishment Contract required DOD/DLA to pay Yates International progress payments of two months of the estimated contract value in the first delivery order. Two months of the Refurbishment Contract's estimated value was $64,000 (($384,000 ÷ 12) x 2).

50. The progress payments were not to exceed the total value of all delivery orders issued.

51. Because Yates International is a small business with limited resources, receipt of the progress payments was essential to meet start-up costs at its Holland facility. DOD/DLA was

informed of the importance of the progress payments to Yates International during pre-bid meetings.

52. DOD/DLA issued delivery order 0001 for 2,150 cylinders under the Refurbishment Contract on September 23, 2003. The estimated value of delivery order 0001 was $86,000.

53. On October 18, 2003, Yates International submitted a request for progress payment in the amount of $57,600, based on incurred costs of $64,000.

54. On October 23, 2003, Yates International submitted a request for a second progress payment in the amount of $19,800, based on total incurred costs of $86,000. The combined amount of Yates International's requests for progress payment was $77,400 ($64,000 + $19,800).

55. On September 24, 2003, DOD/DLA modified the Refurbishment Contract to add progress payments to delivery order 0001 in the amount of $64,000.

56. On November 19, 2003, Yates International requested in writing the CO's assistance in obtaining the progress payments.

57. On November 25, 2003, Yates International again requested in writing the CO's assistance in obtaining the progress payments.

58. Subsequently, notwithstanding the September 23, 2003 modification adding the progress payments, DOD/DLA informed Yates International that the progress payment provision was erroneously included in the Refurbishment Contract and that progress payments were not permitted in such contracts.

59. To date, Yates International has not received any progress payments as required by the Refurbishment Contract.

60. Due to the absolute necessity of progress payments to Yates International's ability to perform the Refurbishment Contract, Yates International would not have bid on either the Refurbishment Contract or Refill Contract if the progress payment provision had not been included.

61. DOD/DLA's improper withholding of progress payments caused Yates International to suffer significant cash flow problems and supply chain disruptions.

62. DOD/DLA's improper withholding of progress payments also caused Yates International to obtain replacement funds from a commercial bank as a loan.

63. DOD/DLA's failure to make timely progress payments caused Yates International to incur finance charges on loans that it borrowed specifically to finance costs that resulted from Government delays.

64. DOD/DLA's failure to make timely progress payments caused Yates International to be unable to timely pay its suppliers and subcontractors, who refused to perform without payment, resulting in delay of Yates International's performance of the contract.

65. The Refurbishment Contract included the prompt payment clause at FAR 52.232-25. The Government's failure to pay the progress payments violated the contract's prompt payment clause.

66. Yates International's performance of the Refurbishment Contract was delayed at least 45 days by the Government's failure to make progress payments under the contract.

Hydrostatic Testing:

67. At the start of the Refurbishment Contract, all of the 11,101 medical oxygen cylinders, including those to be converted to "technical grade oxygen," had expired hydrostatic test dates.

68. Under U.S. Department of Transportation ("DOT") regulations, compressed gas cylinders with expired hydrostatic test dates may be transported on U.S. roads.

69. However, it is a violation of European Union ("EU") law to transport compressed gas cylinders with expired hydrostatic test dates on EU roads.

70. The Refurbishment Contract required Yates International to repaint 500 cylinders filled with medical oxygen, re-label them as "technical grade oxygen," and then transport them to DOD/DLA customers in Germany.

71. Although Yates International obtained an exemption to transport DOT-certified cylinders on EU roads without separate Dutch certification, DOT/Dutch certifications and exemptions are completely distinct from the issue of expired hydrostatic test dates.

72. In October 2003, Yates International informed DOD/DLA that the 500 cylinders to be converted to "technical grade oxygen" had to be vented and hydrostatically tested to meet EU transportation regulations. These cylinders could not just be repainted, relabeled, and transported on EU roads with expired hydrostatic test dates.

73. On May 24, 2004, DOD/DLA reiterated its position that, with regard to transporting cylinders with expired hydrostatic test dates, U.S. and EU regulations "are the same" and that the 500 cylinders should just be repainted and relabeled.

74. However, on June 15, 2004, DOD/DLA changed its position and stated that it concurred with Yates International's recommendation that the 500 cylinders should be vented, hydrostatically tested, and refurbished instead of just being repainted and re-labeled.

75. Yates International was required to bring the 500 cylinders to be converted to "technical grade oxygen" with expired hydrostatic test dates into EU regulatory compliance.

76. Yates International's conversion of 500 medical oxygen cylinders to "technical grade oxygen" cylinders under the Refurbishment Contract was delayed 225 days due to expired hydrostatic test dates.

Suspension of Work and Change in Scope:

77. On December 1, 2003, DSCR instructed Yates International to suspend operations on the Refurbishment Contract in order to fill 20 orders, totaling more than 100 compressed gas cylinders, which were being shipped to Yates International's Holland facility. These cylinders, once filled, were to be given to U.S. Army troops scheduled to deploy to Iraq.

78. This unanticipated requirement, accompanied by a DSCR imposed deadline, caused Yates International to redirect all of its resources from the Refurbishment Contract to the cylinders for the deploying U.S. Army troops.

79. Yates International's performance of the Refurbishment Contract was delayed at least 30 days by the Government's suspension of work and constructive change of the scope of the contract.

**The Refill Contract**

80. The Refill Contract, Contract No. SP0450-03-D-4141, is a one-year, fixed-price, requirements contract, with nine one-year option periods, for the refill, storage and delivery of filled compressed gas cylinders to selected DOD/DLA customers in Germany.

81. The Refill Contract was awarded to Yates International on September 30, 2003. The total estimated price of the Refill Contract in the base year was $564,802. Yates International was awarded an option for a second year on August 30, 2004.

82. Under the Refill Contract, the 11,101 compressed gas cylinders refurbished under the Refurbishment Contract were to be filled with various gases and then delivered to requesting DOD/DLA customers within three days of receipt of an order.

83. In conjunction with delivering full cylinders to DOD/DLA customers, Yates International would pick up used cylinders, perform maintenance on the empty cylinders and dispose of unserviceable cylinders.

84. Yates International was also required to maintain a rotating pool of various types of filled cylinders at its Holland facility for distribution to DOD/DLA customers in Germany.

85. Yates International was given 90 days to ramp-up to be able to fully support the Refill Contract.

86. The Refill Contract included a list of locations in Germany where filled cylinders were to be delivered.

87. Under the written contract, the minimum delivery order quantity was one cylinder, while the maximum delivery order quantity was one truckload of the same or mixed cylinders.

88. However, prior to and after execution of the Refill Contract, the CO told Yates International that the Refill Contract "was the same as the National Welders contract." Under the National Welders contract, an earlier DOD/DLA contract under which Yates International was a subcontractor, the minimum delivery order quantity was one truckload of cylinders.

89. Delivery time for orders placed by DOD/DLA customers was three days for in-stock cylinders (i.e., in the Contractor's pool) and 30 days for out-of-stock cylinders.

90. On February 8, 2005, DSCR issued a Show Cause Notice to Yates International.

91. According to the Show Cause Notice, the CO was considering termination because Yates International had "73 delinquent delivery orders under contract SP0450-03-D-4141 . . all more than 30 days delinquent."

92. In the Show Cause Notice, the CO also requested assurances that Yates International could fulfill the contract.

93. On March 3, 2005, DSCR unilaterally terminated the Refill Contract for default.

94. According to the notice of termination, which was issued by contract modification, the contract was terminated because of Yates International's "not making delivery of the contract." The notice alleged no other acts or omissions that constituted default.

95. The termination for default was not based on alleged anticipatory repudiation.

96. The notice included a statement that it was the final decision of the CO and informed Yates International of its right to bring an action directly in the United States Court of Federal Claims within twelve months of the date of receipt of the CO's decision.

Pallets:

97. Under the Refill Contract, Yates International was required to fill and then transport the filled compressed gas cylinders via ground transportation to various DOD/DLA customers throughout Germany.

98. The Refill Contract states that "[a]ll government furnished pallets, bins . . . used to transport the empty cylinders to the Contractor's fill plant shall be reused to transport the full cylinders to their destination."

99. The Refill Contract further states that "[t]he transportation of full and empty cylinders in U.S. Government or Contractor owned steel bins, baskets, pallets, or other similar devices is authorized provided such means of transportation meets or exceeds all DOT *and European country regulations*" (emphasis added).

100. Based on the above provisions of the Refill Contract, pallets furnished by the U.S. Government were required to meet or exceed EU ground transportation requirements.

101. At the Defense Distribution Depot Europe at Germersheim, Germany, the cylinders were initially made available to Yates International on U.S. Government-furnished wooden pallets that did not meet EU ground transportation requirements.

102. EU regulations, which are more stringent than DOD/DLA regulations, mandate that compressed gas cylinders transported on EU roads, including roads in Germany and Holland, must be loaded vertically on 3- or 4-sided steel pallets known as "T-Carts."

103. Ramstein Air Base ("Ramstein"), the major U.S. military air transportation hub in Germany, would not accept cylinders on wooden pallets for transportation onboard U.S. military aircraft.

104. In a February 27, 2004 "Memorandum For Record" of a February 20, 2004 meeting with Yates International, DSCR acknowledged Ramstein's prohibition on wooden pallets, stating that it agreed to "look at modifying the requirements for T-carts, to be able to . . . meet Ramstien's [sic] . . . requirements."

105. Yates International notified the CO of the pallet/T-Cart issue on or before September 18, 2003, which was before the Refill Contract was awarded.

106. In an October 7, 2003 e-mail, the CO acknowledged the pallet/T-Cart issue to Yates International, stating "about the new T-car [sic] style, just hold on for a while. We are undergoing management changes and a physical location move soon!"

107. Subsequently, DOD/DLA authorized Yates International to research and design T-Carts that would meet EU roadway transportation regulations.

108. Shipment of filled compressed gas cylinders under the Refill Contract could not begin until T-Carts meeting EU requirements were received by Yates International.

109. On December 3, 2003, DOD/DLA modified the Refill Contract to purchase 200 T-Carts, which were to be delivered to Yates International's Holland facility. On December 4, 2003, the CO sent a fax to Yates International stating that DOD/DLA would buy 200 T-Carts so that Yates International could begin shipping filled cylinders "next week" (mid-December 2003).

110. The failure of DOD/DLA to initially provide, or later approve and procure in a timely manner, compressed gas cylinder pallets/T-Carts that met or exceeded EU requirements caused Yates International to be significantly delayed before it could begin shipping filled cylinders on EU roads.

111. Yates International's performance of the Refill Contract was delayed for at least 70 days by the Government's failure to provide pallets that complied with relevant regulations.

Cylinder Documentation:

112. Yates International was required to comply with both U.S./DOD/DLA *and* EU regulations, which are typically more stringent than U.S./DOD/DLA regulations.

113. EU regulations require production and verification of a cylinder's documentation, which includes date of manufacture, testing history, etc., before that cylinder can be filled with compressed gas.

114. DOD/DLA did not have documentation for any of the 11,101 cylinders.

115. Due to DOD/DLA's failure to provide cylinder documentation, Yates International was required to expend time and resources to obtain it directly from the cylinder manufacturers.

116. Yates International, under EU regulations, could not begin filling any of the 11,101 cylinders until it obtained the cylinder documentation.

117. Yates International's performance of the Refill Contract was delayed at least 30 days by the Government's lack of documentation for any of the 11,101 cylinders.

Quantity and Type of Cylinders:

118. Due to safety concerns (e.g., the possibility of explosion), the type of gas that a previously filled compressed gas cylinder can hold is restricted. Further, because more gas can be placed into cylinders with higher pressure ratings, orders for larger volumes of gas require cylinders rated at a higher pounds-per-square inch ("PSI") level.

119. Notwithstanding these safety concerns, DOD/DLA repeatedly directed Yates International to fill some of the medical oxygen cylinders with gases, including hydrogen, which could have resulted in an explosion.

120. Notwithstanding these safety concerns, DOD/DLA repeatedly directed Yates International to fill some of the 2015-PSI cylinders with volumes of gas that exceeded their PSI rating.

121. Because there were no suitable cylinders among the 11,101 Refurbishment Contract cylinders, orders for "I-valve" carbon dioxide ("CO2"), acetylene, and 2400-PSI oxygen were to be filled in cylinders provided by DOD/DLA. However, DOD/DLA failed to provide cylinders in time for Yates International to meet numerous orders for "I-valve" CO2, acetylene, and 2400-PSI oxygen.

122. Yates International could not process most of the 74 orders cited by DOD/DLA as the basis for termination of the Refill Contract due to the above safety concerns and non-availability of DOD/DLA supplied cylinders.

123. Yates International's performance of the Refill Contract was delayed for at least 75 days by the Government's misrepresentation of the quantity and type of cylinders that would be available for refill.

**Assessment of Reprocurement Costs**

124. The Contracts both incorporate by reference the FAR Default clause for Fixed-Price Supply and Service contracts, FAR 52.249-8.

125. Under FAR 52.249-8(b), if the Government terminates a contract it may acquire supplies or services similar to those terminated and the contractor will be liable to the Government for any excess costs for those supplies or services.

126. On June 29, 2006, the CO issued a final decision approving the Government's claim for $127,576.79 plus interest for alleged reprocurement costs. See Exhibit A.

127. The CO issued this final decision more then 15 months after the Government allegedly incurred reprocurement costs.

128. The CO's final decision referred to docket number "Fed. Cl. No. 06-157C."

129. On information and belief, the CO's final decision was drafted by counsel rather than the CO himself.

130. The CO's final decision of June 29, 2006 states that the Contracts were terminated for "abandonment."

131. The CO's final decision makes no finding that the reprocured services were within the scope of the terminated contract.

132. The CO's final decision makes no comparison between the costs that the Government would have incurred if it had continued to pay Yates International for its services under the terminated Contracts and the expenditures under the alleged reprocurement contracts.

133. When Yates International's refurbishment of a cylinder included replacement of a valve, the cost of the replacement valve was included in the cost of refurbishing the cylinder.

134. The Government did not provide Yates International with cylinder valves as Government-furnished property.

135. Cylinders for which the refurbishment was not complete might not have new valves installed.

136. Yates International did not ship cylinders to Holland.

137. All shipments of cylinders to Holland were conducted by the Government.

138. Yates International had no control over the selection or condition of incoming cylinders.

139. Yates International kept its Holland facility clean.

140. Yates International's Holland facility was kept secured by lock and key.

141. Yates International turned over the keys to the facility to the Government's Quality Assurance Representatives.

142. Yates International's rent for the Holland facility was $10,000 per month.

## COUNT I

## Government Not Entitled to Reprocurement Costs Because Termination of Contracts Was Improper

### A. Termination of Refurbishment Contract Improper Because Plaintiff Was Not in Default Due to Government Delay.

143. Paragraphs 1 through 142 are realleged and incorporated by reference as if fully set forth herein.

144. The Government delayed Yates International's performance of the Refurbishment Contract by providing cylinders with deteriorated caps, failing to make progress payments, refusing to cooperate with Yates International's efforts to comply with EU transport regulations and suspending operations on the Refurbishment Contract.

145. The Government delayed Yates International's performance of the Refurbishment Contract by a total of at least 225 days.

146. When the Refurbishment Contract was terminated for default, because of Government delay, Yates International's late delivery was excused.

**B. Termination of Refurbishment Contract Improper for Failing to Comply with Required Procedures.**

147. Paragraphs 1 through 146 are realleged and incorporated by reference as if fully set forth herein.

148. On information and belief, the CO did not consider whether termination of the Refurbishment Contract for the convenience of the Government would be more appropriate than termination for default.

149. The CO did not provide a copy of the Show Cause Notice to the small business specialist and the Small Business Administration ("SBA") Regional Office nearest to the Contractor.

150. In deciding whether to terminate the contract for default, the CO did not consider the effect of the termination for default on the Contractor's capability as a supplier under other contracts and other pertinent facts and circumstances.

151. The Government's failure to include the small business specialist and the SBA in its termination decision and failure to consider the effects of termination on the Contractor was prejudicial to Yates International and in violation of applicable regulations.

C. **<u>Termination of Refurbishment Contract Improper Because Alleged Default Was Severable From the Remainder of the Contract.</u>**

152. Paragraphs 1 through 151 are realleged and incorporated by reference as if fully set forth herein.

153. If the Refurbishment Contract was terminated because of the Contractor's failure to complete performance of CLIN 0010, refurbishment of medical oxygen cylinders, termination was improper because CLIN 0010 was severable from the remainder of the contract.

154. The Government's right to terminate for default is limited to the severable parts of the contract that are in default.

155. The Government's termination of the entire Refurbishment Contract rather than the severable portion that was alleged to be in default imposed undue hardship on Yates International.

156. The Government's termination for default of the entire Refurbishment Contract rather than the severable portion which allegedly was in default is improper and should be converted to a termination for the convenience of the Government.

D. **<u>Termination of Refill Contract Improper Because Plaintiff Was Not in Default Due to Government Delay.</u>**

157. Paragraphs 1 through 156 are realleged and incorporated by reference as if fully set forth herein.

158. The Government delayed Yates International's performance of the Refill Contract by failing to provide pallets that complied with EU regulations and customer requirements, failing to provide Yates International with required cylinder documentation and failing to provide the quantity and types of cylinders required for refill.

159. The Government delayed Yates International's performance of the Refill Contract by a total of at least 145 days.

160. When the Refill Contract was terminated for default, because of Government delay, Yates International's late delivery was excused.

**E. <u>Termination of Refill Contract Improper for Failing to Comply with Required Procedures</u>.**

161. Paragraphs 1 through 160 are realleged and incorporated by reference as if fully set forth herein.

162. On information and belief, the CO did not consider whether termination of the Refill Contract for the convenience of the Government would be more appropriate than termination for default.

163. The CO did not provide a copy of the Show Cause Notice to the small business specialist and the SBA Regional Office nearest to the Contractor.

164. In deciding whether to terminate the contract for default, the CO did not consider the effect of the termination for default on the Contractor's capability as a supplier under other contracts and other pertinent facts and circumstances.

165. The Government's failure to include the small business specialist and the SBA in its termination decision and failure to consider the effects of termination on the Contractor was prejudicial to Yates International and in violation of applicable regulations.

166. The Government's termination of the Contracts for default was arbitrary and capricious and an abuse of the CO's discretion, and does not give rise to the Government's exercise of its right to assess Yates International for its reprocurement costs.

## COUNT II

### CO's Final Decision Has No Basis for Charging Yates International for Missing Valves

167. Paragraphs 1 through 166 are realleged and incorporated by reference as if fully set forth herein.

168. The CO's final decision lacks any facts to support its conclusion that the Government paid Yates International $32,837.50 for valves.

169. The CO's final decision lacks any support for the conclusion that the Government had paid Yates International for refurbishing 2,627 cylinders that the Government found at the Yates International facility.

170. The CO's final decision asserting a claim of $32,837.50 lacks a basis in fact.

171. The Government did not incur the alleged costs of missing valves in acquiring services to replace those that were terminated.

172. The CO's final determination that Yates International is liable for $32,837.50 for missing valves is arbitrary and capricious and an abuse of the CO's discretion.

## COUNT III

### Reprocured Services Exceeded Requirements of Terminated Contracts

173. Paragraphs 1 through 172 are realleged and incorporated by reference as if fully set forth herein.

174. The Refurbishment Contract was terminated because Yates International allegedly failed to deliver 357 refurbished cylinders that were due on December 5, 2004.

175. The Refill Contract was terminated because Yates International's performance of certain delivery orders was allegedly delinquent.

176. Neither of the termination notices for either of the Contracts states that abandonment of the facility was a reason for termination.

177. The CO's final decision cites no contract clause or specification that establishes how Yates International was required to secure Government-furnished property at the Yates International facility.

178. The CO's final decision cites no contract clause or specification that establishes the level of cleanliness to be maintained at the Yates International facility.

179. The CO's final decision fails to identify or describe the alleged debris scattered around the facility.

180. The CO's determination that Yates International is liable for $31,837.41 to secure the facility and $62,901.88 for removal of debris from the Yates International facility is arbitrary and capricious and an abuse of the CO's discretion.

**COUNT IV**

**Government Did Not Act Reasonably to Minimize Its Excess Costs**

181. Paragraphs 1 through 180 are realleged and incorporated by reference as if fully set forth herein.

182. In repurchasing the terminated services, the CO failed to perform his obligation to obtain competition to the maximum extent practicable and to repurchase at as reasonable price as practicable.

183. The Government did not act reasonably to minimize its excess costs when it engaged a replacement contractor to take control of the Government-furnished property for four weeks at a cost of $31,837.41 and engaged a replacement contractor to clean the facility for $62,901.88.

184. The CO's determination that Yates International is liable for $31,837.41 to secure the facility and $62,901.88 for removal of debris from the Yates International facility is arbitrary and capricious and an abuse of the CO's discretion.

**PRAYER FOR RELIEF**

WHEREFORE, Yates International respectfully requests judgment against the United States of America as follows:

A. The Government's termination of the Contracts for default was arbitrary and capricious and an abuse of the CO's discretion, and does not give rise to the Government's exercise of its right to assess Yates International for its reprocurement costs;

B. The CO's final determination that Yates International is liable for $32,837.50 for missing valves is arbitrary and capricious and an abuse of the CO's discretion;

C. The reprocured services exceeded the requirements of the terminated Contracts and the CO's determination that Yates International is liable for $31,837.41 to secure the facility and $62,901.88 for removal of debris from the Yates International facility is arbitrary and capricious and an abuse of the CO's discretion;

D. The Government did not act reasonably to minimize its excess costs and the CO's determination that Yates International is liable for $31,837.41 to secure the facility and $62,901.88 for removal of debris from the Yates International facility is arbitrary and capricious and an abuse of the CO's discretion;

E. Yates International shall be awarded its costs already incurred and such costs as may be incurred on a continuing basis until Defendant fully complies with its contractual obligations;

F. Yates International shall be awarded interest and costs, including attorney fees, as permitted by law, together with such other and further relief as the Court deems just and appropriate.

Dated: August 3, 2006

Respectfully submitted,

Robert E. Korroch
Thomas O. Mason
Francis E. Purcell, Jr.
Williams Mullen, P.C.
Fountain Plaza Three, Suite 200
721 Lakefront Commons
Newport News, Virginia 23606
757.249.5100 (telephone)
757.249.5109 (facsimile)
Attorneys for Plaintiff

#1125382 v2 - COFC Appeal of Reprocurement Costs

EXHIBIT A

**DEFENSE LOGISTICS AGENCY**
**DEFENSE SUPPLY CENTER RICHMOND**
**8000 JEFFERSON DAVIS HIGHWAY**
**RICHMOND, VIRGINIA 23297-5100**

IN REPLY REFER TO DSCR-FAS

JUN 29 2006

Mr. H. James Yates
President
Yates International, LLC
2314 60th St., P.O. Box 9206
Hampton, Virginia 23670-0260

**CERTIFIED MAIL NO: 7002 3150 0000 3928 5180**

Re: Final Decision, Yates International, LLC vs. United States of America, Fed. Cl. No. 06-157C

Dear Mr. Yates:

**Introduction**

This is a contracting officer's final decision, pursuant to the Contract Disputes Act, 41 U.S.C. § 605(a), demanding payment by Yates International LLC and/or Yates Fire Protection Service, Inc. ("Yates") of $127,576.79, in connection with costs incurred by the Government resulting from Yates' abandonment of two contracts.

**Background**

On September 16, 2003, Defense Supply Center Richmond (DSCR), a field activity of the Defense Logistics Agency (DLA), awarded contract SP0450-03-D-1411 to Yates Fire Protection Service, Inc. for the refurbishment of 11,101 cylinders stored at Pirmasens, Germany (the "Refurbishment Contract"). On September 29, 2003, DSCR awarded contract SP0450-03-D-4141 to Yates Fire Protection Service, Inc. to provide industrial gas support to various military installations in Germany (the "Refill Contract"). The contracts were subsequently modified to identify Yates International, LLC, a company related to Yates Fire Protection, as the contractor. Both contracts were substantially performed at a facility in Spijkenisse, Holland (the "Yates facility"). Both contracts included clause 52.249-8, Default (Fixed-Price Supply and Service).

In December 2004, Yates informed DSCR that it was experiencing financial difficulties performing the contracts. It submitted a request for equitable adjustment (REA) on both contracts. DSCR granted in part the REA for the Refurbishment Contract and the parties executed a bilateral modification to the contract on February 11, 2005, whereby DSCR agreed to pay $42,921.75 to settle Yates' REA. DSCR denied the REA for the Refill Contract. DSCR also sent show cause letters to Yates requesting assurances that it would continue to perform the contracts. Yates did not respond to the show cause notices. On February 25, 2005, Yates abandoned the Yates facility. The contracts were terminated for default on March 3, 2005.

An inspection of the facility found that Yates had abandoned significant amounts of Government-Furnished Property (GFP), including 8,731 gas cylinders, at the Yates facility. Although the Government had paid for valves for all of the cylinders, 2,627 of the abandoned cylinders did not include valves. According to Trevor Noble, the manager at the Yates facility, the cylinders were shipped to Holland without valves by Jim Yates, a principal in Yates Fire Protection and Yates International. The Refurbishment Contract set the price for cylinder valves at $12.50. Using this valuation, $32,837.50 in GFP was unaccounted for. Further, in addition to the abandoned GFP, Yates also left other debris scattered around the facility. Yates also left the facility completely unsecured. On March 9, 2005, DSCR sent a letter to Yates Fire Protection and Yates International noting that Yates had abandoned the Yates facility and would be held responsible for potential losses of GFP. Yates did not return to secure the GFP.

DSCR was therefore forced to expediently secure the GFP at the Yates facility. On March 10, 2005, DSCR issued contract SP0406-05-M-Z791 to Exploitatiemaatschappij Laanweg BV, the owner of the Yates facility property, to lease the property and provide security for four weeks until a replacement contractor could take control of the GFP. This contract cost DSCR $31,837.41. On May 3, 2005, DSCR issued contract SP0406-05-D-4067 to International Gas & Services, NV ("IGS") to perform the remainder of the Refurbishment Contract and Refill Contract.[1] This contract included a separate line item, CLIN 9905, for cleaning up the debris in the Yates facility and removing of the GFP to an IGS facility. The costs for the performance of this line item are $62,901.88.

**Determinations**

1. The Government's requirements under contract SP0406-05-M-Z791 arose as a direct result of Yates' abandonment of the contract and the subsequent termination for default. The services covered by this contract were similar to those acquired under the Refurbishment Contract and Refill Contract. Thus, Yates is liable for $31,837.41 based on clause 52.249-8, Default (Fixed-Price Supply and Service), in the Refurbishment and Refill Contracts, as well as common law breach of contract.

2. The Government's requirements under CLIN 9905 under contract SP0406-05-D-4067 arose as a direct result of Yates' abandonment of the contract and the subsequent termination for default. The services covered by this contract were similar to those acquired under the Refurbishment Contract and Refill Contract. Thus, Yates is liable for $62,901.88 based on clause 52.249-8, Default (Fixed-Price Supply and Service), in the Refurbishment and Refill Contracts, as well as common law breach of contract.

3. The GFP cylinders abandoned by Yates were missing 2,627 cylinder valves. Yates accepted payment for the valves. Yates is therefore liable for its failure to obtain and/or secure the cylinder valves in the amount of $32,837.50.

---

[1] Contract SP0406-05-D-4067 is ongoing and the Government is not therefore able to assess the entire reprocurement costs it will incur under this or any other follow-on contract to the Refill Contract and Refurbishment Contract. However, because the nature of CLIN 9905 of the contract is severable from the remainder of the contract because it was a one-time cost resulting from Yates International's default, the Government is asserting damages for this single CLIN now. By doing so, the Government is in no way forfeiting or waiving its right to seek additional reprocurement costs from Yates in the future under this or any other contract.

The Government hereby demands payment of $127,576.79, plus interest. This is a final decision of the Contracting Officer. You may appeal this decision to the Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive the decision, mail or otherwise furnish written notice to the Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. Instead of appealing to the Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

Edward G. West
Contracting Officer
Supplier Support Division

Mr. H. James Yates
President
Yates International, LLC
2314 60th St., P.O. Box 9206
Hampton, Virginia 23670-0260

7002 3150 0000 3928 5180

DEFENSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER RICHMOND
8000 JEFFERSON DAVIS HIGHWAY
RICHMOND, VIRGINIA 23297-5100
DSCR-FAS
OFFICIAL BUSINESS

CERTIFIED MAIL

7002 3150 0000 3928 5180

Mr. H. James Yates
President
Yates International, LLC
2314 60th St., P.O. Box 9206
Hampton, Virginia 23670-0260

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To: Mr. H. James Yates
President
Street, Apt. No.; or PO Box No.: Yates International, LLC
2314 60th St., P.O. Box 9206
City, State, ZIP+4: Hampton, Virginia 23670-0260

7002 3150 0000 3928 5180